UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

TRICIA KERRIDGE,

    Plaintiff,

v.                                            Case No. 1:15-CV-1039

UNITED OF OMAHA LIFE INSURANCE       HON. GORDON J. QUIST
COMPANY,

    Defendant.
_____/

## OPINION

Plaintiff, Tricia Kerridge, has sued Defendant, United of Omaha Life Insurance Company (United), under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, seeking review of United's decision denying her long-term disability benefits. United has filed the Administrative Record and the parties have filed cross-motions for judgment on the Administrative Record in accordance with the procedures set forth in *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998).

For the reasons set forth below, the Court will grant United's motion and affirm its decision denying benefits.

### I. STANDARD OF REVIEW

The parties agree that the Court must apply the de novo standard in reviewing United's decision to deny Kerridge's claim for benefits. This standard applies to both factual and legal determinations by a plan administrator. *Rowan v. Unum Life Ins. Co. of Am.*, 119 F.3d 433, 435 (6th Cir.1997). "In the ERISA context, the role of the reviewing federal court is to determine whether

the administrator or fiduciary made a correct decision, applying a *de novo* standard." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir.1990). "This review is limited to the administrative record and the court is obligated to determine whether the administrator properly interpreted the plan and if the insured was entitled to benefits under the plan." *Kaye v. Unum Group/Provident Life & Accident*, No. 09–14873, 2012 WL 124845, at *5 (E.D. Mich. Jan.17, 2012) (citing *Perry*, 900 F.2d at 967). "The administrator's decision is accorded no deference or presumption of correctness." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir.2002) (citing *Perry*, 900 F.2d at 966). "When conducting a de novo review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir.1998) (citations omitted).

## II. BACKGROUND

Kerridge was employed by SAF-Holland, Inc. as a Business Unit Financial Analyst, a sedentary position that involved sitting and walking. (ECF No. 7-6 at PageID.664.) During her employment with SAF, SAF maintained Group Policy, No. GLTD-AEMS, issued by United, that provided long-term disability (LTD) benefits to eligible SAF employees. (ECF No. 7-1 at PageID.42–71.) The Policy is an "employee welfare benefit plan" within the meaning of § 3(1) of ERISA, 29 U.S.C. § 1002(1), and Kerridge was a participant eligible for coverage under the Policy. (ECF No. 5 at pageID.12.)

The Policy defines "disability" and "disabled" as:

> because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
>
> (a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

>    (b)   unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.
>
> After a Monthly Benefit has been paid for 2 years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.[1]
>
> Disability is determined relative to your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

(ECF No. 7-1 at PageID.68–69.) Material duties are

> the essential tasks, functions, and operations relating an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than 40 hours per week in itself to be part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.

(*Id.* at PageID.69.) An employee's regular occupation "means the occupation You are routinely performing when Your Disability begins." (*Id.* at PageID.70.)

On April 6, 2014, Kerridge submitted a claim for LTD benefits to United, claiming that she became disabled on October 22, 2013, due to "pass[ing] out unexpectedly, loss of memory, [and] can't function normally." (ECF No. 7-6 at PageID.662; *see also* ECF No. 7-2 at PageID.232 (describing passing out suddenly and briefly).) Kerridge identified Dr. Ramona Wallace as the physician who was treating Kerridge for her disability and also indicated that she had received treatment at the Cleveland Clinic from March 26, 2014 to the present.[2] (*Id.* at PageID.663.) The employer portion of the claim form stated that Kerridge's job required occasional standing and walking (0-33%), continuous sitting (67-100%), and frequent reaching/working overhead (34-66%). *(Id.* at PageID.669.) The employer portion also stated that reasonable accommodations on a

---

[1] Only the first part of the definition of disability—Kerridge's ability to perform the material duties of her own Financial Analyst job during the first two years—is at issue in this case.

[2] It appears that at some point during the treating relationship with Kerridge, Dr. Wallace was initially known as Dr. Kwapaizewski and later changed her name to Dr. Wallace as a result of a marriage.

3

temporary or permanent basis could be made for Kerridge to perform her job. (*Id.* at PageID.669.) In the Physician's Statement, Dr. Wallace described Kerridge's claimed disability as 9-CM 781.0 (abnormal involuntary movements)[3], dystonia (a movement disorder in which the muscles contract involuntarily, causing repetitive or twisting movements)[4], low Vitamin D, "possible genetic syndrome," "chronic condition–idiopathic," and "unable to perform [treatment] - etiology[5] unclear." (ECF no. 7-5 at PageID.525–26.)  Dr. Wallace restricted Kerridge from sitting, standing, and walking for more than one hour in an eight-hour workday, driving/operating equipment, lifting/carrying, use of hands in repetitive motions, use of feet in repetitive increments, bending, squatting, crawling, climbing, and reaching above shoulder level. (*Id.* at PageID.526.)

**A.     Medical Evidence**

   **1.     2013 Studies**

In October 2013, Dr. Wallace ordered a Holter monitor recording (a device that monitors a person's heart rhythm).[6] The results were "normal," with no evidence of couplets or ventricular tachycardia and "no significant tachy- nor bradyarrhythmias." (ECF No. 7-5 at PageID.534.)

On October 22, 2013, an MRI study was performed on Kerridge's brain. The study found "[n]o mass or area of abnormal signal intensity" and "a small cyst in the pineal gland, unchanged from previous studies."[7] Overall, the study was "[e]ssentially negative." (*Id.* at PageID.530.) A

---

[3]http://www.icd9data.com/2012/Volume1/780-799/780-789/781/781.0.htm.

[4]http://www.mayoclinic.org/diseases-conditions/dystonia/home/ovc-20163692.

[5]What is the cause of the diagnosis?

[6]http://www.mayoclinic.org/tests-procedures/holter-monitor/basics/definition/prc-20015037.

[7]Kerridge previously underwent an MRI study on November 16, 2008. The October 22, 2013 report noted "[n]o significant change from the previous exam." (*Id.* at PageID.531.)

second MRI study, performed on December 9, 2013, reported a "[s]table MRI of the brain" with "[n]o discrete sellar [sic] mass . . . identified." (*Id.* at PageID.532.)

### 2. Dr. Wallace's Office Notes

Dr. Wallace saw Kerridge six times between the date Kerridge last worked and August 2014—December 19, 2013, January 8, 2014, February 12, 2014, February 28, 2014, and August 18, 2014. (ECF No. 7-2 at PageID.166–190.)

- **December 19, 2013 Office Visit**. In this visit, Kerridge reported that her syncope, or fainting episodes, began one month ago, occurred "daily," and were "mild." Kerridge also reported a history of acne, insomnia/sleep problems, and hyperlipidemia/lipids. Kerridge reported that the symptoms from the insomnia were "worsening," and that the fainting symptoms were "moderate" and occurred weekly. Kerridge's medications included Lorazepam (prescribed 4/15/13), Seroquel (prescribed 12/19/13), and Drisdol (prescribed 12/19/13). A review of "systems" was "positive" for fatigue; dizziness, extremity weakness, and memory impairment; anxiety and depression; and muscle weakness." Dr. Wallace's findings on physical exam were all "normal." Dr. Wallace reported that the dizziness was attributable to hyperparathyroidism, due to low vitamin D, which, in turn, was secondary to previous bariatric surgery. (*Id.* at PageID.166–68.)

- **January 8, 2014 Office Visit**. Kerridge reported hyperlipidemia/lipids that was "mild" and "[un]changed" and insomnia/sleep problems, with "improving" symptoms. Kerridge's list of medications remained the same. The review of systems indicated no problems in any category. Dr. Wallace's findings on physical exam were all "normal." Kerridge reported that her insomnia was improved with the Seroquel and she requested an increase in the dosage to 50 mg. at night. (*Id.* at PageID.170–72.)

- **February 12, 2014 Office Visit**. In this visit, Kerridge reported insomnia/sleep problems, with improving symptoms, and nausea that was "mild" and intermittent. Kerridge's medications remained the same. The review of systems indicated no problems except for anxiety, depressed mood, depression, marked diminished interest or pleasure. Dr. Wallace's findings on physical exam were all "normal." Dr. Wallace reported that the etiology of Kerridge's dizziness was "unclear." (*Id.* at PageID.177–79.)

- **February 28, 2014 Office Visit**. In this visit, Kerridge reported a history of insomnia/sleep problems with "unchanged" symptoms. Kerridge also reported that "her tremors and memory loss [were] getting worse." The list of medications remained unchanged. The review of systems was positive for dizziness, extremity weakness, headache, memory impairment, numbness in extremities, tremors; and

5

    anxiety, depression. Dr. Wallace's findings on physical exam were all "normal." (*Id.* at PageID.181–83.)

- **August 18, 2014 Office Visit**. In her last visit, Kerridge reported a history of syncope that "occur[red] daily and ha[d] not changed," and produced symptoms of "tremors and memory loss," and musculoskeletal pain that occurred "constantly and [wa]s worsening." Kerridge's medications included Amantadine HCL, CO Q-10, Lorazepam, and Ativan. The review of systems indicated no problems. Dr. Wallace reported all "normal" physical exam findings. (*Id.* at PageID.187–89.)

### 3. Cleveland Clinic Records

Unable to determine the specific etiology of Kerridge's syncope, Dr. Wallace referred Kerridge to the Cleveland Clinic for consultation and evaluation. Kerridge was seen at the Cleveland Clinic from March 26, 2014 through August 2014, during which time numerous tests were administered to Kerridge. On April 28, 2014, Dr. Wilson of the Cleveland Clinic reported to Dr. Wallace that Kerridge's "neurological, cardiac, and endocrine test[s] [were] stable," and that they had no answers for Kerridge's syncope. (ECF No. 7-3 at PageID.297.)

In April 2014, the Cleveland Clinic performed a study on Kerridge for sleep apnea, a condition that causes individuals to stop breathing for short periods of time during sleep. The sleep study reported "[m]ild overall obstructive sleep apnea exacerbated to the severe in REM supine sleep" and "[a]bnormal sleep architecture likely due to respiratory events, PAP titration and first night effect." (ECF No. 7-2 at PageID.224–27.) Cleveland Clinic recommended that Kerridge start CPAP (continuous positive airway pressure) therapy. (*Id.* at PageID.224.)

On July 17, 2014, Cleveland Clinic took a muscle biopsy from Kerridge's thigh. (ECF No. 7-3 at PageID.357.) Microscopic analysis of the biopsy revealed "[m]ild non-specific abnormalities." (*Id.*) On August 5, 2014, an electron microscopy was performed on the biopsy for evidence of metabolic or mitochondrial disease.[8] The findings were:

---

[8] In simple terms, mitochondria are "tiny 'power plants'" contained in almost all cells "that produce a body's essential energy." *See* http://mitochondrialdiseases.org/mitochondrial-disease/ (last visited Jan. 5, 2017). Mitochondrial disease occurs when these "power plants" fail to function properly by producing energy. Because the "disease takes

6

> In general, there is a normal organization of thick and thin filaments. In many fibers, there is a mild increase in number of mitochondria and glycogen particles in intrasarcomeric locations. Clusters of small lipid vacuoles are common. No paracrystalline inclusions are seen within the mitochondria. These changes are non-specific, but in the appropriate clinical context could be interpreted as supportive of a metabolic disorder. Correlation with clinical presentation and other relevant laboratory studies is recommended.
>
> Electron microscopy diagnosis: increase in number of mitochondria and glycogen particles and clustering of lipid vacuoles.

(*Id.* at PageID.323.)

In an August 29, 2014, letter to Dr. Wallace, Dr. Wilson reported that Kerridge had "a mitochondrial myopathy and no cardiac involvement."[9] (ECF No. 7-5 at PageID.476.) Dr. Wilson prescribed vitamin B12, carnitor[10], and conenzyme Q10[11], and recommended that Kerridge participate in Curves (an exercise program) and water aerobics "[f]or her overall health and conditioning." (*Id.*)

### 4.    Work-Excuse Slips

During 2014, Dr. Wallace issued three slips excusing Kerridge from work. The first slip, dated January 8, 2014, excused Kerridge from work until March 5, 2014, and imposed no work restrictions. (*Id.* at PageID.475.) The second slip, dated February 28, 2014, excused Kerridge until May 28, 2014, and imposed no work restrictions. (*Id.* at page ID.474.) The third slip, dated May 30, 2014, excused Kerridge until August 28, 2014, and also imposed no work restrictions. (*Id.* at PageID.473.)

---

many different forms and no two people may look alike," it may mimic other better known diseases, such as autism, Parkinson's, and chronic fatigue syndrome. *Id.*

[9] A myopathy is "a muscular disease in which the muscle fibers do not function for any one of many reasons, resulting in muscular weakness." https://en.wikipedia.org/wiki/Myopathy.

[10] Carnitor is a diet supplement used to treat low levels of carnitine, a substance that helps the body use certain chemicals for energy and to maintain good health. http://www.webmd.com/drugs/2/drug-4488/carnitor-oral/details.

[11] Coenzyme Q10 is an antioxidant made by the human body, that is needed for basic cell function. http://www.mayoclinic.org/drugs-supplements/coenzyme-q10/background/HRB-20059019.

**B.     United's Initial Denial**

On August 25, 2014, United sent Kerridge a letter stating that it had reviewed the medical evidence that Kerridge had submitted in support of her application for LTD benefits and concluded, in light of the pertinent Policy provisions, that "there [was] no medically based evidence to suggest restrictions and limitations to preclude [Kerridge] from any activity from [her] last day worked forward." (ECF No. 7-3 at PageID.314.) Therefore, United denied Kerridge's application but informed Kerridge that she was entitled to appeal the claim decision within 180 days. Subsequently, Kerridge retained counsel, who filed an appeal on behalf of Kerridge. (ECF No. 7-2 at PageID.159.)

In connection with Kerridge's appeal, United retained Mohammed J. Zafar, M.D., board certified in neurology and clinical neurophysiology, to conduct an independent medical examination (IME) of Kerridge for evaluation of fainting, memory loss, insomnia, and sleep apnea. (ECF no. 7-2 at PageID.144.) Dr. Zafar reviewed Kerridge's history of complaints with her, reviewed her "extensive available medical records," and physically examined Kerridge. (ECF No. 7-1 at PageID.132–33; ECF No. 7-2 at PageID.135–36, 144–45. ) In the neurologic portion of his IME report, Dr. Zafar stated:

> Higher Functions: Alert and well oriented. Speech was fluent. Memory was 1/3 for immediate objects recall within two minutes on 2 different trials. Remote memory was also intact. Language, expression, comprehension, and flow of thought were normal. Attention span was also normal. Affect-flat. Naming and repetition were intact. There was no right-to-left confusion or agnosia. She scored 28/30 on the Mini-Mental status Examination. She stated that she is unable to perform any simple calculations. She was able to write a sentence quite legibly and with good penmanship. When she was unable to recall objects, she became quite tearful.
>
> Cranial Nerves: Visual fields were full to confrontation testing. Pupils were equal, round and reactive to light. Funduscopic examination was benign. Extraocular movements were conjugate and full. No nystagmus, facial numbness or weakness was noted. Sensation on the Weber test was found to be midline. Shoulder shrugs were equal. The tongue and palatal movements were normal. Intermittent titubation was noted.

> Motor Exam: Motor examination revealed giveaway type weakness of the hand grips. Otherwise, normal strength and tone in the extremities. Rapid alternating movements were performed symmetrically and there was no finger-to-nose dysmetria.
>
> The muscle stretch reflexes were symmetric and the response to plantar stimulation was bilaterally down-going.
>
> Sensory Exam: Sensory examination was intact to light touch, sharp, and proprioceptive sensations.
>
> She was noted to have normal range of spine movements. She was able to transfer from sitting to standing, transfer to exam table and back to chair without any difficulty. She was also able to remove her jacket, socks and shoes and put them back on without any difficulty.
>
> Romberg's test was negative.
>
> She was able to ambulate without difficulty and without support. However, [she] has the slight limp on the right side. Normal arm swing bilaterally. She had difficulty performing tandem walking. She walks fairly briskly with the help of a cane.

(*Id.* at PageID.137–38.)

Dr. Zafar also answered a series of questions posed by United. In particular, Dr. Zafar stated that Kerridge's "[l]imitations appear to be more cognitive/neuropsychological in nature," and suggested that "[n]europsychological evaluation may be considered to better evaluate reasonable restrictions and limitations." (*Id.* at PageID.139.) Dr. Zafar also opined that, given the absence of any conclusive medical evidence suggesting a cause for Kerridge's symptoms, "it would be difficult to suggest any major restrictions and limitations from a neurologic standpoint," although he noted that a musculoskeletal syndrome may limit Kerridge from performing activities such as reaching or working overhead and that her sleep disorder may require restrictions and limitations as to driving. (*Id.*) Dr. Zafar also noted a "paucity of findings both on exam and on the extensive testing (other than the sleep study) which do not reflect the impressions in the medical records." (*Id.*) Finally, in response to a question about verbal statements or physical behaviors that were inconsistent with Kerridge's reported symptoms, Dr. Zafar stated:

9

> It is difficult to explain that with an accounting degree, years of cost analysis and fairly normal Mini-Mental status, she has difficulty performing simple calculations and is currently unable to balance her checkbook. She also displayed an increased emotional response to memory testing. She had no difficulties with positional transfers which would be expected with a myopathy.

(*Id.* at PageID.140.)

### C. United's Denial of Kerridge's Appeal

On May 8, 2015, United informed Kerridge's counsel by letter that it had denied Kerridge's appeal. (ECF No. 7-1 at PageID.90.) United indicated that its decision was based on the records from Dr. Wilson and the Cleveland Clinic, the other records in Kerridge's file, and Dr. Zafar's report from the IME. (*Id.* at PageID.91.) United noted that "Dr. Zafar reported that Ms. Kerridge's clinical examination and testing does not show any definite evidence for an intracranial structural or peripheral neurologic disorder." (*Id.* at PageID.91–92.) United also noted that Dr. Zafar indicated that any limitations would be "more cognitive in nature and may be addressed appropriately by a neuropsychological evaluation," but stated that "we do not have any information to conclude that Ms. Kerridge is seeking the care for a psychological disorder." (*Id.* at PageID.92.) United thus concluded that Kerridge was not entitled to benefits because the evidence did not show that Kerridge would be unable to perform the material duties of her sedentary Financial Analyst occupation. (*Id.*)

Thereafter, Kerridge filed the instant action seeking review of United's decision.

### III. DISCUSSION

### A. Kerridge Fails to Meet Her Burden of Establishing Disability

In order to show that she is entitled to LTD benefits, Kerridge must present objective evidence to support a finding that she is disabled within the terms of the Policy. *See Javery v. Lucent Techs., Inc. Long Term Disability Plan*, 741 F.3d 686, 700 (6th Cir. 2014). Although Kerridge argues that "the great balance of medical evidence in this case" supports her claim of disability (ECF No. 9 at PageID.696), the medical evidence discussed above belies this assertion.

10

While it is true that, in the Physician's Statement Kerridge furnished in support of her claim, Dr. Wallace specified various medical conditions or disorders as bases for Kerridge's claimed disability and cited numerous restrictions, these statements are unsupported, and even contradicted, by evidence in the record.  For example, although Dr. Wallace conducted or ordered numerous medical tests on Kerridge, none of the tests supported that Kerridge was unable to perform any of the duties of her sedentary Financial Analyst position.  Similarly, Dr. Wallace's office notes consistently reflect normal exam findings, including the areas of memory and orientation. (ECF No. 7-2 at Page ID.168, 171, 179, 183, 188-89.)  Moreover, while Dr. Wallace did issue three "disability notices," as Kerridge describes them, none of the notices or slips indicated that Kerridge was limited or restricted from performing any of the material duties of her job.  In fact, the last "disability notice," issued on May 30, 2014, said that Kerridge could return to work on August 28, 2014. (ECF No. 7-5 at PageID.473.)  Because Dr. Wallace never amended this notice or provided an additional notice stating that Kerridge would be off work after August 28, 2014, United could reasonably conclude that Kerridge was not disabled after that time.

The records and medical tests from the Cleveland Clinic also fail to show that Kerridge was disabled under the Policy.  As noted above, Dr. Wilson reported to Dr. Wallace on April 28, 2014, that Kerridge's "neurological, cardiac, and endocrine test[s] [were] stable," and that there were no answers for Kerridge's syncope (fainting). (ECF No. 7-3 at PageID.297.)  A sleep study performed the same month indicated that Kerridge experienced mild overall obstructive sleep apnea and recommended that she start CPAP therapy.  Kerridge followed through on the recommendation, and in July 2014, reported that "she [wa]s doing well with [CPAP], [and] notice[d] [the] benefit[s] of restful sleep and relief of migraines."  Kerridge said that daytime sleepiness, energy level, and restful sleep were improved. (ECF No. 7-2 at PageID.216.)  Subsequently, in August 2014, an electron microscopy of a biopsy of Kerridge's muscle tissue taken in July 2014 revealed a

11

"mitochondrial myopathy and no cardiac involvement." (ECF No. 7-5 at pageID.476.) Dr. Wilson prescribed vitamin B12, carnitor, and conenzyme Q10 and recommended activities for Kerridge's overall health and conditioning, (*id.*), but did not indicate that mitochondrial myopathy restricted Kerridge in any way that would prevent her from performing her job. Given the lack of any medical evidence in the record that Kerridge's sleep apnea (which had improved with CPAP therapy) or her diagnosis of mitochondrial myopathy warranted restrictions or somehow limited Kerridge from performing the material duties of her Financial Analyst position, there is no sufficient basis to conclude that Kerridge is disabled under the Policy.

      Finally, Dr. Zafar's IME of Kerridge highlights the absence of any objective medical evidence supporting Kerridge's claim that she was disabled. Dr. Zafar reviewed Kerridge's medical complaints with Kerridge, reviewed her medical records, and physically examined Kerridge. Dr. Zafar reported mostly normal findings and indicated that he was unable to identify any restrictions and limitations from a neurologic standpoint given the absence of medical evidence suggesting a cause for Kerridge's symptoms. (ECF No. 7-2 at PageID.139.) Kerridge argues that Dr. Zafar's IME findings and opinions must be rejected because Dr. Zafar spent only one day meeting with Kerridge, reviewing her medical records, and examining Kerridge, but nothing Kerridge argues suggests that Dr. Zafar's IME was not thorough and accurate. For example, although Dr. Zafar did not specifically refer to Dr. Wilson's finding of "mitochondrial myopathy" in his answers to United's questions, the section of his report listing the medical records he reviewed included the records pertaining to Dr. Wilson's finding of mitochondrial myopathy and the sleep disorder study. (*Id.* at PageID.135–36.) Moreover, Dr. Zafar noted that Kerridge "had no difficulties with positional transfers which would be expected with a myopathy." (*Id.* at PageID.140.) Thus, Kerridge fails to identify an adequate basis for rejecting Dr. Zafar's opinions.

Kerridge argues that several cases suggest that the Sixth Circuit strongly prefers the medical opinions of treating physicians to those of physicians like Dr. Zafar, who are hired by insurance companies to conduct an IME. The cases Kerridge cites, *Hoover v. Provident Life and Accident Insurance Co.*, 290 F.3d 801 (6th Cir. 2002), *Calvert v. Firstar Finance, Inc.*, 409 F.3d 289 (6th Cir. 2005), and *Kalish v. Liberty Mutual/Life Assurance Co. of Boston*, 419 F.3d 501 (6th Cir. 2005), do not support her argument. In *Hoover*, the court concluded that the insurer's decision to accept the opinions of its own physicians, who had not examined the plaintiff and only reviewed her medical records, over the opinion of the plaintiff's treating physician, to deny benefits was incorrect. *Hoover*, 290 F.3d at 809. In *Calvert*, the court said that an insurer's "reliance on a file review does not, standing alone, require the conclusion that [the insurer] acted improperly," although it noted that "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295. The court also confirmed that it found "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Id.* at 296. Similarly, consistent with *Calvert*, the court in *Kalish* said that whether a doctor physically examined a claimant—as opposed to conducting only a file review—is one factor bearing on a court's analysis of whether a plan administrator acted arbitrarily and capriciously in denying benefits. *Kalish*, 419 F.3d at 508. None of the foregoing cases suggests, as Kerridge argues, that opinions of treating physicians are preferred over opinions of plan-retained physicians who perform an IME and actually examine the claimant. Moreover, *Calvert* and *Kalish* both make clear that a plan administrator's reliance on a file review, alone, is not enough to conclude that the plan administrator acted improperly. Finally, even if the Court accepted Kerridge's proposed rule and disregarded Dr. Zafar's IME, the Court would still reach the same conclusion because the balance of the medical evidence does not show that Kerridge was disabled.

Next, Kerridge faults United for failing to employ a vocational expert to support its determination that Kerridge was not unable to perform her job. "[A] plan administrator is not required to obtain vocational evidence where the medical evidence contained in the record provides substantial support for a finding that the claimant is not totally and permanently disabled." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 662-63 (6th Cir. 2013). Here, as noted above, there is substantial medical evidence that Kerridge was not disabled. Moreover, because Dr. Wallace did not restrict Kerridge from working after August 28, 2014, and Dr. Wilson did not restrict Kerridge from working at all, there is no medical opinion evidence that Kerridge was unable to return to work. Thus, there was no need for a vocational analysis.

Kerridge next argues that United's decision must be reversed because United engaged in selective review, or "cherry-picking" of the evidence in the medical file to support its denial of benefits. While a plan administrator may not engage in a selective claim review process by relying only upon evidence that is favorable to the claimant, *see Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002), Kerridge fails to support this argument by describing the evidence that United allegedly ignored. Thus, this argument also fails.

Finally, Kerridge argues that United has an inherent conflict of interest because it determines eligibility for benefits and pays those benefits. "If the standard of review is *de novo*, then the significance of the administrator's conflict of interest evaporates." *Price v. Hartford Life & Accident Ins. Co.*, 746 F. Supp. 2d 860, 866 (E.D. Mich. 2010). Because the Court has reviewed United's decision to deny benefits under a de novo standard of review and has not deferred to United's determination, any asserted conflict of interest is irrelevant to the Court's analysis.

**B.      The Court May Not Consider the Favorable Social Security Determination**

In paragraph 13 of her complaint, Kerridge alleges that she applied for, and obtained, Social Security disability benefits. (ECF No. 1 at pageID.3.) There is no dispute that the favorable Social Security award was not part of the administrative record that United reviewed.

The law in the Sixth Circuit is clear: regardless of the standard of review, "the district court [is] confined to the record that was before the Plan Administrator." *Wilkins*, 150 F.3d at 615 (citing *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990)); *accord Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (noting that because the proffered evidence did not concern a procedural challenge to the administrator's decision, "consideration of evidence outside the administrative record would be improper"); *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005) ("Our review is confined to the administrative record as it existed on July 11, 2002, when Unum issued its final decision upholding the termination of Moon's LTD benefits."). Accordingly, because the favorable Social Security determination was not before United at the time it issued its final decision, this Court may not consider it in reviewing United's decision to deny Kerridge's claim for benefits.

The cases Kerridge cites in support of her argument that "applicable Sixth Circuit authorities on point hold that an ERISA benefits denial decision is an ongoing decision and the parties may supplement the administrative record at any time up until the Court decides litigation deriving from that denial," (ECF No. 11 at PageID.732), are unavailing. For example, in *Williams v. International Paper Co.*, 227 F.3d 706 (6th Cir. 2000), the additional evidence was actually presented to the plan administrator during the administrative appeal, but the plan administrator declined to consider it. *Id.* at 709–10. In *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514 (6th Cir. 1998), the claimant's attorney submitted additional materials to the plan administrator approximately 10 days after the administrator denied the claimant's appeal. Although the

15

administrator initially indicated that it was reviewing the new materials, five days later the administrator said that it would not consider the materials because they were not timely submitted. *Id.* at 518. While the Sixth Circuit ultimately affirmed the denial of benefits, it concluded that the administrator acted arbitrarily and capriciously in refusing to consider the additional materials because the plan did not contain a procedure for appealing a denial of a preauthorization claim for benefits. *Id.* at 521. Finally, an administrative record was not at issue in *Best v. Cyrus*, 310 F.3d 932 (6th Cir. 2002), because *Best* involved claims by a plan and its current trustees against a former trustee for breach of fiduciary duty, not a claim for benefits. Thus, *Best* is inapposite to the instant case. In any event, the administrative record in the instant case closed on May 8, 2015, when United denied Kerridge's appeal. Because Kerridge never presented the Social Security award to United during the administrative appeal, this Court may not consider it in reviewing United's denial of benefits.[12]

### IV. CONCLUSION

For the foregoing reasons, the Court will grant United's motion for judgment on the administrative record, deny Kerridge's motion for judgment on the administrative record, and affirm United's decision denying Kerridge LTD benefits.

An Order consistent with this Opinion will be entered.


Dated: January 10, 2017                               /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE

---

[12] Kerridge also argued that the Court may consider the Social Security award because United cited several websites in its opening brief that were not part of the administrative record. (ECF No. 11 at PageID.733–34.) This argument lacks merit. The websites are not medical evidence specific to Kerridge. Instead, United referred to the websites in the same manner as a dictionary or other text—solely as background to explain medical terms, medications, and the like, referred to in the administrative record.